UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION and AIRLINE PROFESSIONALS ASSOCIATION OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL UNION NO. 1224,<br><br>Plaintiffs,<br><br>v.<br><br>ALASKA AIR GROUP, INC, and HORIZON AIR INDUSTRIES. INC.,<br><br>Defendants. | CASE NO. C17-1327-MJP<br><br>ORDER GRANTING MOTION TO DISMISS |

THIS MATTER comes before the Court on Defendants' Motion to Dismiss (Dkt. No. 27.) Having reviewed the Motion, the Response (Dkt. No. 51), the Reply (Dkt. No. 53), the Supplemental Briefs (Dkt. Nos. 74, 78), and all related papers, and having considered the parties' submissions at oral argument, the Court GRANTS the Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1).

**Background**

Plaintiffs International Brotherhood of Teamsters, Airline Division and the Airline Professionals Association of the International Brotherhood of Teamsters, Local Union No. 1224 (collectively, the "Union") filed this action against Defendants Alaska Air Group, Inc. ("AAG") and Horizon Air Industries, Inc. ("Horizon")[1] seeking declaratory and injunctive relief under the Railway Labor Act, 45 U.S.C. § 151 et seq. (Dkt. No. 20 at ¶ 1.)

The Union alleges that, under the terms of a 2016 Letter of Agreement ("LOA"), AAG and Horizon committed to acquiring no fewer than 30 Embraer-175 regional jet aircraft ("E175s"), to be flown exclusively by Horizon pilots represented by the Union (the "Union Pilots"). (Id. at ¶ 2.) In Counts I and II, the Union alleges that Defendants have violated the LOA by allowing SkyWest Airlines ("SkyWest") to operate five of these E175s (the "SkyWest E175s"). (Id. at ¶¶ 40, 43.) In Count III, the Union alleges that Defendants' decision was motivated by "anti-union animus" and intended "to embarrass, discredit, and diminish the Union in the eyes of its members . . . drive it from the labor market, and, ultimately, destroy it." (Id. at ¶ 46.)

Defendants moved to dismiss under Rules 12(b)(1) and 12(b)(6). (Dkt. No. 27.) Thereafter, the Court ordered expedited discovery to allow the Union to respond to Defendants' jurisdictional arguments. (Dkt. No. 32.) That discovery has now been completed, and reveals the following facts relevant to this Motion:

---

[1] Horizon serves as a regional carrier for Alaska Airlines, Inc. ("Alaska"). Both Alaska and Horizon are wholly-owned subsidiaries of AAG. (Dkt. No. 27 at 10; Dkt. No. 1 at ¶¶ 8-9.)

**A. The LOA**

On February 1, 2016, Horizon and the Union entered into a collective bargaining agreement ("CBA"), which incorporated the LOA. (Dkt. No. 27 at 11.)

The LOA provides, in relevant part, as follows:

> 1. <u>Regional Jet Order</u>
>
> A. It is the intention of AAG to request authority from the Board of Directors to place an order for 30 (thirty) firm ("Firm") and 30 (thirty) optional ("Option") regional jets with anticipated deliveries beginning in 2017 (herein "Order" or "the Order").
>
> B. This Letter of Agreement and the amended CBA known as the 2016 CBA is contingent on (1) obtaining authorization of the Board of Directors to place the Order, and, (2) on reaching acceptable terms and a binding agreement with an aircraft manufacturer/lessor for delivery of the aircraft.
>
> 2. <u>Flying Commitment</u>
>
> . . .
>
> B. Firm Aircraft
>
> 1. None of the Firm aircraft acquired and placed into revenue service under the Order shall be flown by airlines in which AAG does not have a controlling interest in order to fulfill a capacity purchase agreement with an entity in which AAG has a controlling interest unless the flying is performed by the Pilots.
>
> 2. None of the Firm aircraft acquired and placed into revenue service under the Order shall be flown by airlines in which AAG has a controlling interest in order to fulfill a capacity purchase agreement with an entity in which AAG has a controlling interest unless the flying is performed by the Pilots.
>
> 3. This commitment for 30 (thirty) Firm aircraft shall be reduced by any aircraft acquired and placed for flying by the Pilots through a lease or purchase from another party outside the terms of this Letter of Agreement.
>
> . . .
>
> 7. <u>Delivery Commitment</u>: No fewer than thirty (30) aircraft by December, 2022.

1  (Dkt. No. 20, Ex. 1.)

2  Because E175s offer superior opportunities for training and career advancement, the Union claims it conceded to various wage and benefit reductions for its pilots in exchange for Defendants' commitments in the LOA. (Dkt. No. 20, ¶ 16.)

**B. The Horizon-Embraer Purchase Agreement**

On April 11, 2016, Horizon entered into a purchase agreement with Embraer, S.A. ("Embraer") for 30 Firm E175s and 30 Option E175s (the "Purchase Agreement"). (See Dkt. No. 75, Ex. 3.) The Purchase Agreement sets forth a delivery schedule with anticipated delivery dates for each of the 30 Firm E175s, but does not identify the aircraft with specificity (i.e., by serial number or registration number). (Id. at 4-5.) Instead, the Firm E175s are numbered "1" through "30" based on the order in which they are to be delivered. (Id.) The Purchase Agreement provides anticipated delivery dates between May 2017 and June 2019 for the Firm E175s, and between March 2019 and May 2021 for the Option E175s. (Id.)

**C. Horizon's Pilot Shortage and Inability to Fly the E175s**

During the negotiations over the 2016 LOA, Horizon, like many other airlines, was experiencing a shortage of qualified pilots. (Dkt. No. 27 at 11-12.) Despite efforts to minimize disruptions, including exiting markets, cancelling flights, and transferring Horizon routes to Alaska and SkyWest, by October 2017, a shortage of over 4,000 block hours remained projected. (Id. at 12; Dkt. No. 78 at 8.)

On August 21, 2017, Horizon's President and CEO David Campbell informed the Union that (1) the pilot shortage had devolved to the point where the airline did not have enough pilots to fly the Firm E175s scheduled for delivery in the coming months; (2) the delivery schedules for the Firm E175s could not be deferred; and (3) Defendants would need to move several of the

Firm E175s to SkyWest. (Dkt. No. 14, Ex. 3 at ¶ 16.) Plaintiffs allege that Campbell stated that Horizon was in the process of creating a "leasing subsidiary" to carry out this plan. (Id.)

On August 30, 2017, Campbell sent a communication to all Horizon Pilots stating that it would be:

> pausing the near-term fall and winter deliveries of six E175s. These aircraft will be coming our way in later 2018. By the end of next year, we will have 23 E175 aircraft at Horizon. It's important to note that at that time, we will have the same number of jets as initially planned.

(Id. at ¶ 22 (emphasis in original).)

To date, ten E175s have been delivered to Horizon. (Dkt. No. 20 at ¶ 23; Dkt. No. 27 at 11.) Five E175s were delivered—or as Plaintiffs claim, "diverted"—to SkyWest, and are now the subject of this litigation.

**Discussion**

**I. Legal Standards**

**A. Federal Rule of Civil Procedure 12(b)(1)**

Under Rule 12(b)(1), the Court must dismiss a complaint over which it lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The burden rests upon the party asserting jurisdiction. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994) (citations omitted). When considering a motion to dismiss under Rule 12(b)(1), the Court is "not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." McCarthy v. United States, 850 F.2d 558, 560 (9th Cir. 1988).

**B. Federal Rule of Civil Procedure 12(b)(6)**

Under Rule 12(b)(6), the Court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Court must construe the complaint in

the light most favorable to the non-moving party, and must accept all well-pleaded allegations of material fact as true and draw all reasonable inferences in favor of the plaintiff. Livid Holdings Ltd. v. Salomon Smith Barney, Inc., 416 F.3d 940, 946 (9th Cir. 2005); Wyler Summit P'ship v. Turner Broad. Sys., Inc., 135 F.3d 658, 661 (9th Cir. 1998). Dismissal is appropriate where a complaint fails to allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555.

**C. Railway Labor Act**

Whether a federal court has jurisdiction to hear a dispute under the RLA turns on whether the dispute is classified as "major" or "minor." Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n ("Conrail"), 491 U.S. 299, 305 (1989). Major disputes generally concern the negotiation or renegotiation of a collective bargaining agreement, and "result from attempts by labor or management to impose new obligations or create new rights." Ass'n of Flight Attendants v. Mesa Air Grp., Inc., 567 F.3d 1043, 1047 (9th Cir. 2009). Minor disputes generally concern the interpretation or application of existing agreements. Conrail, 491 U.S. at 305.

When "an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major." Id. at 307. The carrier's burden is "relatively light," and when in doubt, courts are to construe disputes as minor. Mesa, 567 F.3d at 1047; see also Int'l Ass'n of Sheet Metal, Air, Rail and Transp. Workers, Transp. Div. v. BNSF Ry. Co., Case No.

15-1270RSL, 2015 WL 5159201 (W.D. Wash. Aug. 24, 2015) ("There is a presumption that disputes . . . arise under the governing contract and are therefore minor.").

**II. Counts I and II**

Counts I and II allege that Defendants violated the LOA and thereby violated Section 2, First and Seventh of the RLA. Defendants move to dismiss Counts I and II under Rule 12(b)(1). Defendants contend that their actions were arguably justified under the LOA as (1) the SkyWest E175s were not "acquired and placed into revenue service under the Order"; (2) the SkyWest E175s are not the aircraft "identified in the E175 Purchase Agreement"; and (3) any exclusivity obligations under the LOA were excused by impossibility or impracticability due to the pilot shortage. (See Dkt. No. 27.) The Court considers each of these contentions in turn:

**(1) Whether the SkyWest E175s Were "Acquired" Under the Purchase Agreement**

The LOA provides that "[n]one of the Firm aircraft *acquired and placed into revenue service under the Order* shall be flown . . . unless the flying is performed by the [Union] Pilots." (Dkt. No. 20, Ex. 1) (emphasis added). Defendants contend that because the SkyWest E175s were neither "acquired" by Horizon nor "under the Order" (i.e., the Purchase Agreement), they are not in fact the aircraft contemplated in the LOA. (Dkt. No. 78 at 2; see also Dkt. No. 27 at 17-18.)

The record indicates that the SkyWest E175s were never paid for, delivered to, or accepted by Horizon, but were instead acquired directly by SkyWest. (See Dkt. No. 78 at 3-4.) While Plaintiffs claim the aircraft were "acquired" when Horizon and Embraer entered into the Purchase Agreement, their proposed definition is inconsistent with both the multiphase process by which aircraft are purchased and delivered and New York's Uniform Commercial Code § 2-401, which governs the Purchase Agreement and provides that title transfers when the seller

physically delivers goods or delivers a tangible document of title.  (Id. at 4, n.1; see also N.Y. U.C.C. Law § 2-401(2)-(3).)

**(2) Whether the SkyWest E175s Were Identified in the Purchase Agreement**

The LOA provides a "delivery commitment" of 30 E175s to Horizon by December 2022, but does not include a delivery schedule.  (Dkt. No. 20, Ex. 1.)  Defendants contend that merely "pausing" delivery does not violate the LOA, so long as Horizon receives all 30 aircraft before December 2022.  While Plaintiffs claimed that the Purchase Agreement would identify "specific aircraft" and a "specific delivery schedule" (i.e., by serial number or registration number), the Purchase Agreement does not in fact contain any such identifiers, and there is no clear evidence that the SkyWest E175s were ever "earmarked" for Horizon.  The Purchase Agreement continues to reflect delivery slots for 30 Firm aircraft, and Horizon continues to anticipate accepting delivery of these aircraft by December 2022.  (Dkt. No. 78 at 6.)

**(3) Whether Defendants' Obligations Under the LOA Were Excused by the Pilot Shortage**

Defendants contend that, even if the SkyWest E175s *were* the aircraft identified in and acquired under the Purchase Agreement, their obligations under the LOA would be excused by impossibility or impracticability of performance due to the ongoing pilot shortage at Horizon.  (Dkt. No. 27 at 20.)

At the time they negotiated the LOA, both the Union and Defendants were aware of the ongoing, industry-wide shortage in qualified pilots.  While the Union contends that Defendants cannot now assert impossibility and impracticability as defenses, Defendants respond that in entering into the LOA, they "obviously presumed" that the shortage would abate.  (Dkt. No. 78 at 9.)  However, far from abating, the shortage unexpectedly grew worse, transforming from an industry-wide problem (driven by factors including a reduction in the number of military pilots

seeking positions with commercial airlines and a rise in the number of commercial pilots reaching the age of mandatory retirement) to a carrier-specific problem (driven by pilots departing in search of improved salaries and benefits offered by mainline carriers).

The Court finds that each of these asserted contractual interpretations is arguably justified, and is neither frivolous nor obviously insubstantial.

### (4) Whether Defendants' Asserted Contractual Interpretations are "Insincere" or Made in "Bad Faith"

The Union urges the Court to look beyond the "arguably justified" standard and to conduct a separate inquiry into whether Defendants' asserted contractual interpretations are "insincere" or made in "bad faith." Without deciding whether these concepts are separate from or incorporated into Conrail's "arguably justified" test, the Court finds no evidence of insincerity or bad faith. Instead, the evidence suggests that Defendants considered several options—some which they concluded would violate the LOA—and selected the option they believed would not. For example, Chris Lewless, Horizon's Director of Labor Relations opined that, were Horizon to lease or transfer any of the E175s identified in the Purchase Agreement to SkyWest, they "would likely be in violation" of the LOA. (See Dkt. No. 74 at 4-5.) Brad Tilden, AAG's CEO, stated that although he was "ok taking some risk with the contract . . . we do need to live according to our values and we can't do something that is wrong" (i.e., accept delivery of E175s that Horizon would not be able to fly due to the pilot shortage). (Dkt. No. 75, Ex. 10.)

The Court finds that Defendants have satisfied their "relatively light" burden to show that the dispute is minor under the RLA, and therefore DISMISSES Counts I and II under Rule 12(b)(1).

### III. Count III

Count III alleges that by violating the LOA, Defendants "eliminated the [Union Pilots'] primary return on the Union's bargaining efforts," and that they did so based upon "anti-union animus" and with the intent to "embarrass, discredit, and diminish the Union in the eyes of its members, and thereby to influence, coerce, and/or induce members to decertify the Union as their bargaining representative and/or resign their memberships from the Union" in violation of Section 2, Third and Fourth of the RLA. (Dkt. No. 20 at ¶ 46.) Defendants move to dismiss Count III under Rule 12(b)(1), and in the alternative, for failure to state a claim under Rule 12(b)(6).

Section 2, Third and Fourth of the RLA concern "the precertification rights and freedoms of unorganized employees." TWA, Inc. v. Indep. Fed'n of Flight Attendants, 489 U.S. 426, 440 (1989). Accordingly, "[j]udicial intervention in post-certification RLA cases has traditionally been limited to those instances where 'but for the general jurisdiction of the federal courts there would be no remedy to enforce the statutory commands which Congress had written in to the [RLA].'" Ass'n of Flight Attendants, AFL-CIO v. Horizon Air Indus., Inc., 280 F.3d 901, 905 (9th Cir. 2002) (quoting TWA, 489 U.S. at 442). For example, in cases where "the essential framework for bargaining between management and the union has broken down"; where there is "a fundamental attack on the collective bargaining process" or a "direct attempt to destroy a union"; where "an employer's conduct has been motivated by anti-union animus or where circumstances exist that significantly undermine the functioning of the union . . . that cannot be remedied by administrative means." Id. (citations omitted).

The Court finds that Count III, like Counts I and II, necessarily turns on the terms of the LOA, and like Counts I and II, must be dismissed for lack of subject-matter jurisdiction. If Defendants' decision to postpone delivery of the five E175s does not violate the LOA, it can

hardly evince an intent to destroy the Union. And if Defendants' decision does violate the LOA, the fact that SkyWest is a non-union competitor, without more, is not sufficient to show "anti-union animus." See Twombly, 550 U.S. at 570 (noting that "a formulaic recitation of the elements of a cause of action will not do."). To date, the Union has set forth no facts suggesting that Defendants considered—let alone were motivated by—SkyWest's non-union status. Were the Court to find jurisdiction over Count III on this record, "almost any breach of a CBA could be recast as an affront to the employees' rights to bargain collectively." See Air Line Pilots Ass'n, Int'l v. Guilford Transp. Indus., Inc., 399 F.3d 89, 104 (1st Cir. 2005) (holding that cases involving "violations of a CBA or even the repudiation thereof . . . ordinarily will not come within the ambit" of Section 2, Third and Fourth).

In addition to finding that it lacks subject-matter jurisdiction to hear the claim, the Court finds that the Union has failed to "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" (i.e., "anti-union animus," a "fundamental attack on the collective bargaining process," or a "direct attempt to destroy a union"). Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Horizon, 280 F.3d at 905. Therefore, the Court DISMISSES Count III under Rules 12(b)(1) and 12(b)(6).

**Conclusion**

Having found that it lacks subject-matter jurisdiction over Counts I, II, and III, and that Count III fails to state a claim upon which relief can be granted, the Court GRANTS Defendants' Motion to Dismiss.

The clerk is ordered to provide copies of this order to all counsel.

Dated July 6, 2018.

Marsha J. Pechman
United States District Judge